# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SUCCESS SYSTEMS, INC. and SMART C-STORES, LLC, | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CRS, INC. and SHIN HEUNG PRECISION CO., LTD., | ) | 3:21-CV-1391 (SVN) |
| *Defendants*. | ) | |
| | ) | |
| CRS, INC., | ) | |
| *Counter Claimant*, | ) | March 31, 2023 |
| | ) | |
| v. | ) | |
| | ) | |
| SUCCESS SYSTEMS, INC., | ) | |
| *Counter Defendant*. | ) | |

## RULING AND ORDER ON DEFENDANT CRS, INC.'S MOTION TO TRANSFER AND DEFENDANT SHIN HEUNG PRECISION CO., LTD.'S MOTION TO DISMISS

Sarala V. Nagala, United States District Judge.

Plaintiffs Success Systems, Inc. ("Success") and Smart C-Stores, LLC ("Smart C-Stores") have brought this action against Defendants CRS, Inc. ("CRS") and Shin Heung Precision, Co., Ltd. ("Shin Heung"), alleging that Defendants caused them damages by abruptly terminating business relationships between the parties and breaching a non-disclosure agreement (the "NDA"). Following dismissal of various claims, Plaintiffs' complaint consists of four counts:  breach of contract, alleging violations of the NDA (Count Three); unjust enrichment (Count Four); misappropriation of trade secrets pursuant to Connecticut General Statutes § 35-51 (Count Five); and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Connecticut General Statutes §§ 42-110a *et seq.* (Count Seven).  CRS now seeks transfer of this action to the U.S. District Court for the District of Minnesota pursuant to 28 U.S.C. § 1404(a), while Shin Heung

seeks dismissal of Plaintiffs' claims against it pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction.  For the reasons described below, CRS's motion to transfer is DENIED and Shin Heung's motion to dismiss is GRANTED.

## I.    FACTUAL BACKGROUND

The following facts are drawn from the parties' pleadings and the affidavits and exhibits accompanying their briefing on the present motions.[1]

### A.  The Parties

Success is a Connecticut company that offers automation solutions for convenience, grocery, liquor, tobacco, and gasoline service stations.  SAC, ECF No. 27, ¶ 8; Tarlow Decl. as to CRS's Mot., ECF No. 65-1, ¶ 5.  One of the products Success offers is a tobacco loyalty program named "Smokin' Rebates."  SAC ¶ 8; *see* Sanders Decl., ECF No. 63-2, ¶ 6.  Smokin' Rebates is a rebate reporting system through which major tobacco manufacturers, along with certain consumer packaging companies, offer rebates to store owners, who agree to share tobacco sale and scan data from their stores.  SAC ¶ 9; *see* Sanders Decl. ¶ 6.  Tobacco manufacturers use this data for research and marketing purposes.  SAC ¶ 9.

Since 2010, Success has been a reseller of "SAM4s" electronic cash registers, which are popular among store owners and used in more than sixty countries.  *Id.* ¶¶ 10, 12.  Prior to the

---

[1] The Court may consider matters outside the pleadings when addressing both motions to dismiss for lack of personal jurisdiction, *Al-Ahmed v. Twitter, Inc.*, 553 F. Supp. 3d 118, 124 (S.D.N.Y. 2021), and motions to transfer venue pursuant to section 1404(a), *632 Metacom, Inc. v. Certain Underwriters at Lloyd's*, No. 20-CV-3905 (RA), 2021 WL 394847, at *1 (S.D.N.Y. Feb. 4, 2021).  For purposes of both present motions, all well-pleaded facts in Plaintiffs' Second Amended Complaint ("SAC") are accepted as true, to the extent they are not contradicted by affidavits or other appropriate evidence.  *See MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (for purposes of Rule 12(b)(2) motion, "[t]he allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits"); *Debellis v. Massing*, No. 19-CV-1105 (BMC), 2019 WL 3859001, at *1 (E.D.N.Y. Aug. 16, 2019) (when deciding whether to transfer venue under section 1404(a), "the court must accept as true all of plaintiffs' well-pleaded facts in the complaint, unless they are contradicted by affidavits or other appropriate evidence").

commencement of this litigation, Plaintiff Smart C-Stores,[2] a separate entity with a principal place of business in Connecticut, was also a dealer of these registers. Tarlow Decl. as to CRS's Mot. ¶¶ 5, 15. Shin Heung, a Korean company, manufactures SAM4s registers in South Korea. Kim Decl., ECF No. 49-2, ¶ 5; *see* SAC ¶ 12. According to CRS, Shin Heung is the exclusive developer and owner of the SAM4s operating system, software, and technology. Sanders Decl. ¶ 3.

CRS, a Minnesota corporation, is the exclusive importer of the SAM4s register in the United States. Sanders Decl. ¶ 2.[3] CRS purchases the registers from Shin Heung and then distributes them to its network of dealers and distributors, like Sale Point, Inc. d/b/a Longino Distributing, Inc. ("Sale Point"), a former defendant in this action that was dismissed by stipulation in May of 2022, *id.* ¶ 4; SAC ¶ 4; ECF No. 50. CRS's dealers and distributors then sell the SAM4s registers, along with licenses to use the SAM4s software, to retailers; the dealers and distributors also provide related support services. Sanders Decl. ¶ 4. Success purchases SAM4s registers from Sale Point and resells them to retailers. SAC ¶¶ 8, 12; *see* Sanders Decl. ¶ 5 (describing Success as a "dealer" of the SAM4s registers).

CRS President David Sanders avers that, as a distributor and not a manufacturer, CRS does not have possession, custody, or control over the SAM4s software's source code. Sanders Decl. ¶ 3. Rather, Shin Heung licenses the software in "compiled, executable object code form" to CRS, which sublicenses it to users through an End User License Agreement ("EULA"), which the users are required to accept. *Id.* Sanders further avers that CRS provided Shin Heung with the EULA so that it could be loaded into the SAM4s operating system and presented to users, requiring such users to accept it. *Id.*

---

[2] For ease of reference, Plaintiffs Success Systems, Inc. and Smart C-Stores, LLC, are referred to together in this ruling as "Success," unless otherwise noted.

[3] Shin Heung claims that it has never sold SAM4s terminals to anyone in Connecticut or solicited any business related to such terminals in Connecticut. Kim Decl. ¶ 7.

B.  The Software Development Project

At some point in 2019, Success, CRS, and Shin Heung discussed working together to integrate the Smokin' Rebates program into the "SAM4s 630/6600" cash register system.  SAC ¶ 11; Tarlow Decl. as to CRS's Mot. ¶ 16; Sanders Decl. ¶ 7.  Until that time, the SAM4s registers did not support tobacco rewards or loyalty programs.  SAC ¶ 11.  Success and CRS dispute how the discussions regarding the project originated.  Success asserts that CRS and Shin Heung solicited a partnership with Success, *id.*; Tarlow Decl. as to CRS's Mot. ¶ 16, and that, in or around June of 2019, Success and CRS began discussing the possible writing and integration of code that would enable the SAM4s registers to utilize the Smokin' Rebates program, SAC ¶ 40; Tarlow Decl. as to CRS's Mot. ¶ 17.  CRS, by contrast, asserts that Success solicited CRS about the project. Sanders Decl. ¶ 7.

In July of 2019, Success and CRS signed the NDA so that they could explore and proceed with the software development process.  SAC ¶ 45; Sanders Decl. ¶ 8.  The NDA—which, by its terms, is to be governed by the laws of the state of Connecticut, SAC ¶ 46—provides, in part, that "all Confidential Information disclosed by Owner to Recipient under this Confidentiality Agreement in tangible form (including, without limitation, information incorporated in computer software or held in electronic storage media) shall be and remain property of Owner," *id.* ¶ 47.[4] Pursuant to the NDA, Success supplied CRS with confidential information, which included more than fifty unique and proprietary changes to the SAM4s 630/6600 software.  *Id.* ¶ 51.

Shin Heung is not a party to the NDA, Sanders Decl. ¶ 7, and Shin Heung claims that it has never seen a copy of the agreement, Kim Decl. ¶ 10.  Success alleges, however, that CRS and Success intended that Shin Heung would be a third-party beneficiary of the agreement because it

---

[4] Either CRS or Success could constitute the "Owner" of confidential information under the NDA.  *See* ECF No. 65-1 at 11.

would benefit directly from the disclosure and use of Success' proprietary and confidential trade secrets, and because it would work directly with CRS and Success to develop and integrate the software modification using Success' confidential information and trade secrets.  SAC ¶ 48.

From July of 2019, until May of 2021, Success, Shin Heung, and CRS worked together to develop the new software code, integrate Smokin' Rebates into the SAM4s software, and improve upon the original version of the software.  *Id.* ¶ 49.  Much of the testing and design work for the project was accomplished by employees of Success in its Connecticut offices.  *Id.* ¶ 50; Tarlow Decl. as to CRS's Mot. ¶ 29.  At some point early in the software development process, CRS provided Success with SAM4s registers for the purposes of testing the software.  *See* Tarlow Decl. as to CRS's Mot. ¶ 48 (discussing the "initial delivery of [a] few registers to Success for use as testing machines in furtherance of the joint venture"); Sanders Decl. ¶ 7 (stating that, on or about June 25, 2019, CRS provided Success with "two free SAM4s registers for testing purposes, each including a license to use the Software").

On several occasions, both before and after the execution of the NDA, employees and agents of CRS traveled from Minnesota to Success' offices in Connecticut to solicit a partnership with Success and to complete the software integration.  SAC ¶ 41.[5]  First, CRS employees Diane Voss and Bruce Mann visited Success in Connecticut several times to solicit business.  *Id.* ¶ 43. In addition, in January of 2020, Troy Lachinski, CRS's product manager for the SAM4s register, visited Success in Connecticut to facilitate the integration pursuant to the NDA.  *Id.* ¶ 44.  The first end-user integration of Smokin' Rebates into the SAM4s 630/6600 system occurred in May of 2020, as part of the twenty-ninth version of the software.  *Id.* ¶ 57.

---

[5] Success alleges that, "[u]pon information and belief, while on these trips to Connecticut, these employees and agents of CRS also visited other Connecticut businesses for the purpose of soliciting business in Connecticut."  SAC ¶ 42.

While the software was being developed, CRS and Success exchanged hardware between Minnesota and Connecticut. *Id.* ¶ 54. For example, in furtherance of the software development partnership and pursuant to the NDA, Voss purchased a SAM4s register from Shin Heung and arranged for it to be shipped to Success' offices in Connecticut so that Success could use the register to design, write, and integrate software. *Id.* ¶ 52; Tarlow Decl. as to Shin Heung's Mot., ECF No. 65-1, ¶ 33. On another occasion, a register failed, and Success sent it back to CRS in Minnesota; CRS then repaired the register and sent it back to Success in Connecticut. SAC ¶ 53. CRS and Success also regularly and repeatedly engaged in a "back-and-forth exchange" of software and updates between Minnesota and Connecticut. *Id.* ¶ 54.

Additionally, Success, CRS, and Shin Heung conducted numerous telephone and Skype calls and exchanged data, quality testing documentation, design information, and software versions. *Id.* ¶ 55. On multiple occasions, data, code, and hardware were sent by Shin Heung from Korea to Connecticut. *Id.* ¶ 55; Tarlow Decl. as to CRS's Mot. ¶ 35. Success contends that, pursuant to the NDA, CRS also provided Shin Heung with Success' confidential information in order to accomplish the integration, SAC ¶ 56, and that, on several occasions, Success sent confidential information to Shin Heung after explicitly stating that it was doing so under the protections of the NDA, Tarlow Decl. as to CRS's Mot. ¶ 32. Success further contends that Shin Heung engineers repeatedly communicated with Success either directly or through a CRS project manager. *Id.* ¶ 30.

According to CRS, Success was aware that, in order to connect the SAM4s system with Smokin' Rebates, Shin Heung would need to create a "custom connector application," which would allow SAM4s to remotely connect to Success' network server. Sanders Decl. ¶ 8. Sanders avers that "[t]o verify the custom connector application's functionality, Success merely tested the

Software, solely in its compiled, executable object code form, with Smokin' Rebates using a 'dealer license' provided by CRS, which . . . required it to accept the EULA." *Id.*

Success and CRS hotly dispute whether the EULA indeed applied to Success.  CRS contends that Success, like CRS's other dealers, "was presented with the EULA while registering its dealer license for each individual Software license and was required to affirmatively click 'ACCEPT,' followed by entering a 4-digit Manager Password, and then affirmatively clicking 'ENTER' in order to activate its license and use the Software." *Id.* ¶ 10.  CRS further asserts that, a "user" cannot "activate its license and use the Software" without following these steps.  *Id.* Success, on the other hand, denies that the EULA applies to it, ECF No. 65 at 10–12; Sanders Decl. ¶ 9, asserting that CRS and Shin Heung sent Success multiple versions of the software "not for Success' use as an 'end user' but to test the software as part of the joint venture," Tarlow Decl. as to CRS's Mot. ¶¶ 47, 49.  Success CEO Scott Tarlow avers that, after CRS initially delivered "testing machines" to Success "in furtherance of the joint venture," new versions of the software that were developed during the joint venture were provided to Success through a Google Drive account.  *Id.* ¶ 40.  In support of Success' contention that it was not bound by the EULA, Tarlow further avers that, at times, CRS or Shin Heung would "remotely log into the testing machines and enable the new license directly," which meant that Success would not always be "required to click through the license and, as a result, the EULA." *Id.* ¶ 51.

### C.   The Breakdown of the Relationship Between CRS and Success

Between November of 2020, and May of 2021, Success entered into three agreements to provide goods and services, including SAM4s systems, to three separate stores.  SAC ¶¶ 13–15. Between the three agreements, Success agreed to provide a total of eight SAM4s 630/6600 systems, complete with software licenses, to the stores.  *Id.*  Then, in May of 2021, Success entered

into an agreement with Sale Point to purchase the eight systems and their accompanying software licenses.  *Id.* ¶ 16.  Later that month, Success pressed CRS to remedy certain "logic errors" in SAM4s 630/6600 products.  *Id.* ¶ 18.  Success informed CRS that, due to these logic errors, it would not accept new orders of these products or install any new system beyond the eight systems it had already committed to purchase.  *Id.*  In response, CRS notified Success that it had decided to eliminate the "visible option" for Success' customers to enable Smokin' Rebates in SAM4s systems.  *Id.* ¶ 19.

Success subsequently accepted delivery of the eight SAM4s 630/6600 systems from Sale Point but paid Sale Point for only three of the systems.  *Id.* ¶¶ 20, 21.  On June 1, 2021, and on multiple occasions thereafter, Success requested that Sale Point deliver the software licenses for the eight systems; Success agreed to pay for the licenses if Sale Point assured it that the licenses would be sent.  *Id.* ¶ 22.  In response, Sale Point sent an email demanding payment for the five remaining systems but allegedly would not agree to send the software licenses, even if Success paid for all eight systems.  *Id.*  Instead, Sale Point made clear that it was demanding payment for the remaining systems, terminating its relationship with Success, and refusing to provide any further goods and services to Success.  *Id.* ¶ 24.

Success then attempted to purchase software licenses, for both new and existing customers, directly from CRS.  *Id.* ¶ 25.  In response, CRS refused to supply standard one-year, three-year, or perpetual licenses to Success' customers.  *Id.* ¶ 26.  After protracted discussions, CRS offered to supply temporary, ninety-day licenses to existing customers.  *Id.*  By the time CRS made this offer, however, several of Success' customers had shut down because they were unable to process payments or conduct business.  *Id.* ¶ 27.  As a result, Success was forced to refund stores more

than $35,000, and it claims that it also suffered additional damages due to its inability to perform under its agreements.  *Id.* ¶¶ 28, 29.

According to the SAC, issues with the SAM4s software also affected Success' business on a broader scale.  Specifically, between September of 2019, and May of 2021, Success purchased a total of thirty-eight SAM4s 630/6600 systems from Sale Point.  *Id.* ¶ 30.  Many customers, however, have stopped doing business with Success due to ongoing issues with these systems.  *Id.* ¶ 32.  Success began bringing these issues—which included errors in basic functions, such as balancing and reconciling daily transactions—to the attention of Sale Point and CRS in September of 2019, and continued to do so through June of 2021.  *Id.* ¶¶ 33–35.  Such issues were also brought to the attention of Shin Heung.  *Id.* ¶ 36.  Both CRS and Shin Heung repeatedly assured Success that the issues had been resolved or were being resolved, but Success alleges they were not.  *Id.* ¶¶ 36–38.

Ultimately, on or about May 24, 2021, the business relationship between CRS and Success was terminated.  *Id.* ¶ 58.  As a result, Success demanded that its confidential information be destroyed or returned, or, alternatively, that CRS license such confidential information from Success.  SAC ¶ 59; *see also* Kim Decl. ¶ 10 ("While the software was still in development, CRS requested that Shin Heung disable and delete Success System's [sic] source code.").[6]  Success alleges that CRS has not yet removed Success' confidential and proprietary information from its software, and that CRS continues to use, distribute, and profit from this information.  SAC ¶ 60.

Success further contends that CRS is using and profiting from more than fifty unique, confidential, and proprietary changes to the code embedded in the SAM4s 630/6600 software, which were misappropriated from Success' software.  *Id.* ¶ 61.  Moreover, Success alleges that

---

[6] Shin Heung asserts that it "was never compensated in any way for its work on the software requested by CRS for Success Systems."  Kim Decl. ¶ 12.

CRS is using Success' confidential and proprietary information to install between 200 and 400 new SAM4s 630/6600 systems per month in the United States, including in Connecticut, and to offer rebate reporting through its distributor network. *Id.* ¶¶ 62, 65; Tarlow Decl. as to Shin Heung's Mot. ¶ 43. Finally, Success claims that CRS transferred Success' information to a third-party for purposes of creating a competing tobacco rebate reporting solution, and that CRS and its third-party partner have installed SAM4s machines in at least two commercial locations using Success' intellectual property related to its tobacco rebate reporting solution. SAC ¶ 64.

CRS largely disputes Success' version of events, asserting that the parties were unable to connect the SAM4s system to the Smokin' Rebates program because "Smokin' Rebates and its loyalty function [were] incomplete [and] dysfunctional, and it was impossible to do business with [Success'] erratic and volatile CEO." Sanders Decl. ¶ 12. CRS further contends that Shin Heung deleted the custom connector it had authored to connect SAM4s with Smokin' Rebates because the connector could not be used with any network server other than the server Success used for its program. *Id.* Finally, CRS contends that, pursuant to the EULA, all "right, title and interest in and to" the software at issue belongs to CRS or Shin Heung. *Id.*[7]

## II.    RELEVANT PROCEDURAL HISTORY

Success initiated this action by filing a complaint against CRS, Sale Point, and Shin Heung in Connecticut Superior Court; CRS removed the action to federal court. ECF No. 1. The following claims of the SAC remain live, following various amendments and a stipulation of dismissal of the claims against Sale Point: a claim against CRS and Shin Heung for breach of the

---

[7] In addition, Sanders avers that Success has undertaken a "campaign of harassing CRS's distributors, dealers, and end-users of SAM4s with defamatory statements and threats of litigation," and that Tarlow's "harassment of CRS's distributors and refusal to pay Success's bills created irreconcilable conflicts with them." Sanders Decl. ¶ 13.

NDA (Count Three); a claim against CRS[8] for unjust enrichment (Count Four); a claim against CRS and Shin Heung for misappropriation of trade secrets (Count Five); and a claim against CRS and Shin Heung for CUTPA violations (Count Seven).

In May of 2022, Shin Heung responded to the SAC by filing its present motion to dismiss for lack of personal jurisdiction.  ECF No. 49.  In August of 2022, CRS filed its pending motion to transfer this action to the U.S. District Court for the District of Minnesota.  ECF No. 63.  This action was subsequently reassigned to the undersigned in September of 2022.  ECF No. 68.

## III.   CRS's MOTION TO TRANSFER[9]

CRS's only ground for seeking transfer is that the forum selection clause in the EULA mandates that the venue for the parties' dispute shall be in the state of Minnesota.  Because the Court finds for purposes of the present motion that the EULA did not form an agreement between Success and CRS, CRS's request for transfer is denied.

### A.  Legal Standard

Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division

---

[8] Although the heading of Count Four states that it is asserted "as to CRS and Shin Heung," the count asserts allegations against CRS and Sale Point, not CRS and Shin Heung.  SAC ¶¶ 84–87.  Since Sale Point has been dismissed from this action, the Court construes Count Four as being asserted against CRS only.

[9] The Court rejects CRS's argument that the Court should decide this motion *after* it decides Shin Heung's motion to dismiss.  It is well within the Court's authority to decide a pending motion to transfer before deciding whether it has personal jurisdiction over all defendants.  *See Speedfit LLC v. Woodway USA, Inc.*, ___ F. Supp. 3d. ___, 2022 WL 17167985, at *4 (S.D.N.Y. Nov. 22, 2022) (granting motion to transfer and then declining to reach merits of motion to dismiss for lack of personal jurisdiction).  Indeed, a district court "is authorized to rule on a motion to transfer venue even if [it has] no personal jurisdiction over the defendants."  *Burns v. Grupo Mexico S.A. De C.V.*, No. 07 CIV. 3496 (WHP), 2007 WL 4046762, at *7 (S.D.N.Y. Nov. 16, 2007) (alteration in original) (internal quotation marks omitted).  The Court is unpersuaded by CRS's citation to *Emerald Asset Advisors, LLC v. Schaffer*, 895 F. Supp. 2d 418, 436–37 (E.D.N.Y. 2012), in which the district court found a motion to transfer premature because all defendants had not yet been served.  Here, both Defendants have been served and, therefore, the Court "is able to identify all of the parties" in this action for purposes of its section 1404(a) analysis, *see id.* at 437.  Moreover, if transfer were appropriate, the transferee court's personal jurisdiction analysis would be materially distinct from the personal jurisdiction analysis in this district.  Accordingly, the Court finds it appropriate to address CRS's motion to transfer before turning to Shin Heung's motion to dismiss.

where it might have been brought or to any district or division to which all parties have consented." Section 1404(a) "provides a mechanism for enforcement of forum-selection clauses that point to a particular federal district"; a "proper application" of section 1404(a) "requires that a forum-selection clause be 'given controlling weight in all but the most exceptional cases.'" *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 59–60 (2013).

To determine whether a forum selection clause is enforceable, the Court must ask:  (1) "whether the clause was reasonably communicated to the party resisting enforcement"; (2) whether the clause is "mandatory or permissive," i.e., whether the parties "are required to bring any dispute to the designated forum or simply permitted to do so"; and (3) "whether the claims and parties involved in the suit are subject to the forum selection clause." *Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014).  "If the forum clause was communicated to the resisting party, has mandatory force and covers the claims and parties involved in the dispute, it is presumptively enforceable." *Id.*  A party may only overcome this presumption by "making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Id.*

Where a contract contains both a forum selection clause and a choice-of-law provision, "questions of enforceability are resolved under federal law, while interpretive questions—questions about the meaning and scope of a forum selection clause—are resolved under the substantive law designated in an otherwise valid contractual choice-of-law clause." *Id.* at 224. Thus, in determining whether the scope of a forum selection clause "encompasses the claims or parties involved in a certain suit," the Court must "apply the law contractually selected by the parties." *Id.* at 218.

B. <u>Discussion</u>

The parties' dispute regarding the applicability of the forum selection clause in the EULA hinges on whether the EULA constituted an agreement between CRS and Success. Accordingly, the Court must turn first to the threshold issue of contract formation to determine whether the EULA formed such an agreement. *See Evolution Online Sys., Inc. v. Koninklijke PTT Nederland N.V.*, 145 F.3d 505, 509 (2d Cir. 1998) (vacating dismissal predicated on forum selection clause where district court did not first conclude that a contract was formed between the parties); *Laspata DeCaro Studio Corp. v. Rimowa GmbH*, No. 16 CIV. 934 (LGS), 2017 WL 1906863, at *3 (S.D.N.Y. May 8, 2017) ("Although not framed as such by either party, the issue of whether their agreement incorporates the forum selection clause is a threshold issue of contract formation that must be resolved before addressing whether the clause is enforceable as to the crossclaims.").

In conducting this inquiry, the Court is presented with the preliminary question of which body of law it should apply to determine whether the EULA constitutes a contract between CRS and Success. Although "[i]t is axiomatic that contract formation is governed by state law in the United States," *Wis. Province of Soc'y of Jesus v. Cassem*, 373 F. Supp. 3d 378, 384 (D. Conn. 2019), the parties do not expressly address which state's law should apply in this case. Instead, in their briefing regarding whether the EULA binds Success, the parties generally reference law from the Second Circuit, district courts within this Circuit, and other courts across the country. Then, in a separate discussion regarding whether the NDA superseded the EULA, CRS argues that

Minnesota law should apply under the choice of law provision in the EULA to the extent the law of Minnesota and the law of Connecticut conflict.[10]

As noted, where a contract includes both a forum selection clause and a choice of law provision, the Court typically must apply the law contractually selected by the parties when interpreting the scope and meaning of the forum selection clause. *Martinez*, 740 F.3d at 218. Here, the EULA provides that it "shall be governed by the laws of the State of Minnesota." EULA, ECF No. 63-3, at 10. Thus, if there were no dispute that the EULA formed a binding agreement and the Court were tasked with determining whether Success was bound by that agreement, Minnesota law would govern the Court's inquiry.

Before it can reach questions of contract *interpretation*, however, the Court must determine whether a contract was even *formed*. Though the parties do not frame the issue precisely as such, the thrust of Success' argument is that the EULA was merely a document that it needed to click through to test the software, not a binding agreement between the parties. Thus, the Court must first determine whether the parties formed an agreement in the form of the EULA at all, before it can determine how the EULA should be interpreted; *Martinez* therefore does not mandate the application of Minnesota law. Indeed, as the Second Circuit has observed, applying a choice of law clause to "resolve the contract formation issue" would "presume the applicability of a provision before its adoption by the parties has been established." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012); *see Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 332 (2d Cir. 2005) (the validity of a contractual choice-of-law clause is "a threshold question

---

[10] In other cases, where parties agree that a certain body of law applies to issues of contract formation, courts in this Circuit have applied that body of law. *See Allied Dynamics Corp. v. Kennametal, Inc.*, 965 F. Supp. 2d 276, 298–99 (E.D.N.Y. 2013) (applying a certain United Nations Convention based on parties' agreement that it applied); *Laspata DeCaro Studio Corp.*, 2017 WL 1906863, at *3 (applying German law because the parties agreed it applied). The parties have not agreed here that a particular state's law should apply to the question of whether a contract was formed.

that must be decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clauses").

Here, there are only two potentially competing bodies of state law that may apply: Minnesota law and Connecticut law. Thus, to the extent there is a conflict between the law of these states, the Court must look to Connecticut's choice of law rules to determine which state's law should apply. In this case, however, the relevant principles of contract formation are substantially the same under Minnesota and Connecticut law. Accordingly, the Court need not decide the issue of which state's law applies and will instead look to the law of both states. *See Precision Trenchless, LLC v. Saertex multiCom LP*, No. 3:19-CV-0054 (JCH), 2022 WL 596740, at *8 (D. Conn. Feb. 28, 2022) (finding that, because Connecticut and North Carolina courts "take substantively similar approaches to analyzing contract formation," the court did not need to resolve the "typically thorny choice-of-law question," and thereafter consulting the law of both states); *see also Schnabel*, 697 F.3d at 119 (similar).

Under Connecticut law, "in order to form a contract, generally there must be a bargain in which there is a manifestation of mutual assent to the exchange between two or more parties and the identities of the contracting parties must be reasonably certain." *Ubysz v. DiPietro*, 440 A.2d 830, 833 (Conn. 1981) (citations omitted); *see Saint Bernard Sch. of Montville, Inc. v. Bank of Am.*, 95 A.3d 1063, 1075 (Conn. 2014) (citing *Ubysz*, 440 A.2d at 833). Put differently, "there must be a mutual understanding of the terms that are definite and certain between the parties." *L & R Realty v. Conn. Nat. Bank*, 732 A.2d 181, 188 (Conn. App. Ct. 1999). "To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties." *Id.* "If the minds of the parties have not truly met, no enforceable contract exists." *Id.*; *see NATS, Inc. v. Radiation Shield Techs., Inc.*, No. 22-369,

2023 WL 2416160, at *1 (2d Cir. Mar. 9, 2023) ("In order for an enforceable contract to exist, the court must find that the parties' minds had truly met." (quoting *Tirreno v. Hartford*, 129 A.3d 735, 739 n.5 (Conn. App. Ct. 2015))).   Connecticut courts also typically treat consideration as an essential element of contract formation.   *See Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 252 (2d Cir. 2019) (citing, in part, *Summerhill, LLC v. City of Meriden*, 131 A.3d 1225, 1229 (Conn. App. Ct. 2016)).

Similarly, under Minnesota law, contract formation requires "communication of a specific and definite offer, acceptance, and consideration."   *Com. Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 782 (Minn. Ct. App. 2006).   "To form a contract, mutual assent must exist, which 'entails a meeting of the minds concerning a contract's essential elements.'"   *Vermillion State Bank v. Tennis Sanitation, LLC*, 947 N.W.2d 456, 466 (Minn. Ct. App. 2020) (quoting *SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 864 (Minn. 2011)), *aff'd*, 969 N.W.2d 610 (Minn. 2022).   Minnesota courts "use an objective standard to assess whether mutual assent exists," and they "will not enforce a vague or indefinite contract when it requires speculation about the parties' intent."   *Id.*; *see Shelander v. Johnstech Int'l Corp.*, No. A13-1544, 2014 WL 1408068, at *2 (Minn. Ct. App. Apr. 14, 2014) ("A contract does not exist unless the parties have agreed 'with reasonable certainty about the same thing and on the same terms.'").

Applying these principles from both Minnesota and Connecticut law, the Court cannot find that Success and CRS mutually assented to the terms of the EULA or the forum selection clause therein based on the record before it.   Rather, the record suggests that the EULA was included in the software so that it could eventually bind store owners—or other "end users"—when the software was implemented in the cash register systems of individual stores.   Although Success

apparently clicked "ACCEPT" on the EULA several times during the software development process, it appears that—in order to review and test the software—Success merely needed to *act* as if it were accepting the EULA on behalf of an end user during a software installation. Accordingly, for purposes of CRS's motion to transfer, the Court finds that the EULA did not constitute an agreement between CRS and Success and, therefore, its forum selection clause does not mandate that Success' claims be litigated in Minnesota.

To begin, the terms of the EULA are inconsistent with CRS's argument that it was intended to bind Success while it was developing and testing the SAM4s software. The EULA defines "you" and "your" as "the person or entity for whom the Software is being activated." EULA at 3. The EULA further provides that, "[i]f the Software is being activated by a third-party (for example, a reseller, distributor, dealer, consultant, employee or agent), such third-party represents that it has the authority to bind *the person or entity for whom the Software is being activated*, and that its acceptance of this Agreement . . . does bind *such person or entity*." *Id.* (emphases added). Read together, these provisions suggest that the software generally would not be "activated" within the meaning of the EULA for third-parties, such as resellers, distributors, or dealers; rather, it appears that such third-parties could only bind *others* for whom the software eventually was activated. The record reflects that the parties generally consider Success to be a reseller or dealer. *See* Sanders Decl. ¶ 5 ("Success was one such dealer."); *see also* ECF No. 63-6 at 2 (July 25, 2022, email from CRS's counsel stating that "CRS doesn't have direct contact with end user merchants," and that "Success Systems, as the reseller, has the relationship with its customers"). Accordingly, Success does not appear to fall within the category of parties the EULA was intended to eventually bind.

Moreover, Tarlow avers that CRS did not require Success to click through the EULA each time CRS sent a new iteration of the software for testing. Tarlow Decl. as to CRS's Mot. ¶ 51.

Instead, sometimes "CRS or Shin Heung would remotely log into the testing machines and enable the new license directly" and, "[w]hen CRS would enable the new license directly, Success would not be required to click through the license and, as a result, the EULA." *Id.* That Success did not always have to "accept" the EULA during the software development process further suggests that the EULA was not intended to bind Success during that process. Rather, it appears that clicking through the EULA was merely a necessary step to test the software when CRS or Shin Heung did not remotely log into the machines Success was using to enable the software licenses directly and allow Success to bypass this step.[11]

The Court acknowledges that, under both Connecticut and Minnesota law, the presence of a written agreement is generally strong evidence of a contractual relationship. *See D'Antuono v. Serv. Rd. Corp.*, 789 F. Supp. 2d 308, 323 (D. Conn. 2011) ("[T]he fact that a party signed a written agreement is usually conclusive evidence of contract formation."); *Webb Pub. Co. v. Fosshage*, 426 N.W.2d 445, 449 (Minn. Ct. App. 1988) ("The general rule is that one who signs his name to a writing that purports to be a contract does an act that is strong evidence that he intends to make himself a party thereto, bound as a promisor and entitled as a promisee." (cleaned up)). Here, CRS argues that the EULA constituted a written agreement because Success was required to review the EULA, click "ACCEPT," enter a 4-digit "Manager Password," and then click "ENTER." *See* ECF No. 64-1 at 19 (arguing that these steps constituted a "clickwrap" mechanism for forming an agreement). But the existence of the EULA does not preclude the Court from looking to evidence outside the four corners of that document to determine whether a contract was truly formed between the parties. *See Zhou v. Zhang*, 223 A.3d 775, 788 (Conn. 2020) ("[T]he rule is, that one

---

[11] It is also noteworthy that CRS employee John Soderquist stated in an email to Tarlow that "no Agreement between our companies was relative to the interface being developed." ECF No. 63-21 at 4. He continued: "Specifically in these situations we would be looking for a Statement Of Work (SOW) to define exactly what the end product would be." *Id.*

may show that a writing purporting to be a contract never came into existence as a contract, or has ceased to be a contract, and this may be shown by evidence outside of the writing." (cleaned up)); *Watkins Inc. v. Chilkoot Distrib., Inc.*, 655 F.3d 802, 806 n.4 (8th Cir. 2011) (under Minnesota law, "the parol evidence rule does not apply to the question of whether a contract was formed" (citing *Ridgway v. Hennepin County*, 182 N.W.2d 674, 679 (Minn. 1971)). Here, based on the evidence in the record, the Court cannot determine that the EULA constituted a contract between Success and CRS during the software development process.

Based on the foregoing, it appears that the EULA was merely included in the software because it would eventually bind retail establishments who used the SAM4s software for the Smokin' Rebates program in their stores. In other words, it appears the EULA was intended to eventually bind some other parties—i.e., *end users*, as contemplated by the title of the EULA itself—when the software was implemented in individual stores, and that a reseller such as Success could bind such end users but not itself.[12] Thus, because it is not clear that CRS and Success mutually assented to the EULA, or that the EULA constituted a specific and definite agreement between these parties, the Court will not enforce the forum selection clause in the EULA against Success.

Because CRS's motion relies exclusively on the EULA's forum selection clause, and because the Court has determined that the EULA does not bind Success, CRS's motion must be denied.

---

[12] The Court is unconvinced by CRS's argument that the "DEALER LICENSE" watermark on the EULA shows that the EULA was intended to bind Success. The Court cannot glean from this watermark alone that the EULA was intended to form an agreement between CRS and Success, despite the factors discussed above suggesting that the EULA was *not* intended to bind Success during the software development process.

### IV.   SHIN HEUNG'S MOTION TO DISMISS

Having determined that transfer is unwarranted, the Court turns next to Shin Heung's motion to dismiss for lack of personal jurisdiction.  For the reasons below, the Court finds that exercising jurisdiction over Shin Heung would violate Connecticut's long-arm statute.  Accordingly, the Court grants Shin Heung's request for dismissal.

### A.   Legal Standard

Federal Rule of Civil Procedure 12(b)(2) permits a defendant to raise lack of personal jurisdiction as a defense by motion before a responsive pleading.  The plaintiff bears the burden of establishing personal jurisdiction over the defendant.  *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 728 (2d Cir. 2012).  The showing a plaintiff must make to defeat a defendant's claim that the Court lacks personal jurisdiction over it "varies depending on the procedural posture of the litigation." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).  While a plaintiff has the "ultimate burden" of establishing jurisdiction over a defendant by a preponderance of the evidence, until an evidentiary hearing is held, the plaintiff "need make only a *prima facie* showing by its pleadings and affidavits that jurisdiction exists." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986).  This *prima facie* showing requires "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

In considering whether a plaintiff has made such a *prima facie* showing, the pleadings and any affidavits submitted "are construed in the light most favorable to [the] plaintiff and all doubts are resolved in its favor." *CutCo Indus., Inc*, 806 F.2d at 365; *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993) ("If the parties present conflicting affidavits, all factual disputes are

resolved in the plaintiff's favor, and the plaintiff's *prima facie* showing is sufficient notwithstanding the contrary presentation by the moving party." (italicization added)).  Here, Shin Heung has not requested, and the Court has not held, an evidentiary hearing.  Thus, Success is required only to make a *prima facie* showing that this Court possesses personal jurisdiction over Shin Heung.

"Personal jurisdiction over a defendant in a diversity action is determined by the law of the forum in which the court sits."  *CutCo Indus., Inc*, 806 F.2d at 365.  Under both Connecticut Supreme Court and Second Circuit precedent, determining whether a court has personal jurisdiction requires a two-step analysis:  first, the Court must determine whether Connecticut's long-arm statute supports the Court's exercise of personal jurisdiction over the foreign defendant; second, the Court must determine whether such exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.  *Samelko v. Kingstone Ins. Co.*, 184 A.3d 741, 748 (Conn. 2018) (in assessing a motion to dismiss for lack of personal jurisdiction, the trial court must first decide whether the state long arm statute "authorizes the assertion of jurisdiction" over the defendant and, if so, then decide whether the exercise of jurisdiction over the defendant "would violate constitutional principles of due process"); *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163–64 (2d Cir. 2010) ("To determine personal jurisdiction over a non-domiciliary . . . the Court must engage in a two-step analysis. . . . First, we apply the forum state's long-arm statute. . . . If the long-arm statute permits personal jurisdiction, the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." (citations omitted)).

Connecticut General Statutes § 33-929(f) is the provision of Connecticut's long-arm statute that governs personal jurisdiction in suits against foreign corporations.  Section 33-929(f) provides:

Every foreign corporation shall be subject to suit in this state, by a resident of this state or by a person having a usual place of business in this state, whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows:

1. out of any contract made in this state or to be performed in this state;

2. out of any business solicited in this state by mail or otherwise if the corporation has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the state;

3. out of the production, manufacture or distribution of goods by such corporation with the reasonable expectation that such goods are to be used or consumed in this state and are so used or consumed, regardless of how or where the goods were produced, manufactured, marketed or sold or whether or not through the medium of independent contractors or dealers; or

4. out of tortious conduct in this state, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance.

Section 33-929(f) "confers jurisdiction over designated causes of action without regard to whether a foreign corporation transacts business in Connecticut and without regard to a causal connection between the plaintiff's cause of action and the defendant's presence in this state." *Lombard Bros., Inc. v. Gen. Asset Mgmt. Co.*, 460 A.2d 481, 485 (Conn. 1983).[13]  Rather than a causal connection, section 33-929(f) requires merely "a nexus between the cause of action alleged and the conduct of the defendant within the state."  *Tomra of N. Am., Inc. v. Env't Prods. Corp.*, 4 F. Supp. 2d 90, 93 (D. Conn. 1998) (citation and internal quotation marks omitted).  Here, Success argues that the Court can exercise jurisdiction over Shin Heung pursuant to sections 33-929(f)(1), 33-929(f)(3), and 33-929(f)(4).

---

[13] The Connecticut Supreme Court in *Lombard Bros.* interpreted Connecticut General Statutes § 33-411(c), which has since been repealed.  The relevant part of section 33-411(c), however, was nearly identical to the relevant part of section 33-929(f).  *See Lombard Bros.*, 460 A.2d at 485 (quoting section 33-411(c)).  Accordingly, district courts interpreting section 33-929(f) have regularly relied on cases interpreting section 33-411(c).  *E.g.*, *Gen. Star Indem. Co. v. Anheuser-Busch Cos.*, No. 3:97-CV-2542, 1998 WL 774234, at *3 n.2 (D. Conn. Aug. 24, 1998) ("As the relevant language of [Conn. Gen. Stat. § 33-929 and § 33-411] is identical, the Court will rely on case law interpreting former Conn. Gen. Stat. § 33-411(c).").

B. Discussion

For the reasons below, the Court finds that Success has failed to make a *prima facie* showing that Connecticut's long-arm statute provides a basis for the Court to exercise jurisdiction over Shin Heung in this action.

*1.  Section 33-929(f)(1)*

The Court first finds that it cannot exercise jurisdiction over Shin Heung pursuant to section 33-929(f)(1).  To establish personal jurisdiction under section 33-929(f)(1), the plaintiff must "establish *prima facie* that a contract existed and that it was meant to be performed in the state within the meaning of the statute."  *Chem. Trading, Inc. v. Manufacture de Produits Chimiques de Tournan*, 870 F. Supp. 21, 23–24 (D. Conn. 1994).  In other words, determining whether section 33-929(f)(1) supports personal jurisdiction over a foreign corporation presents two issues:  first, whether the plaintiff has met its burden to make a *prima facie* showing of a contract for the purpose of supporting personal jurisdiction; and second, whether such contract contemplated performance in Connecticut.

The Connecticut Supreme Court has broadly interpreted the phrase "to be performed," reasoning that it "refers to the performance that the parties contemplated in the contract, without regard to whether it has actually been performed."  *Samelko*, 184 A.3d at 749; *see also Callahan v. Wisdom*, No. 3:19-CV-350 (KAD), 2020 WL 2061882, at * 9 (D. Conn. Apr. 29, 2020) (noting that the Connecticut Supreme Court "takes an expansive view of the phrase 'to be performed' as used in § 33-929(f)(1)").  Whether the defendant has "already performed in the forum" is irrelevant, and "it makes no difference whether . . . the defendant, or another party to the contract was required to perform in this state."  *Samelko*, 184 A.3d at 749–50; *see also Callahan*, 2020 WL 2061882, at *9 ("[P]erformance by *either* party to the contract can satisfy Section (f)(1).").  Rather,

personal jurisdiction under section 33-929(f)(1) is proper when the contract "contemplates performance" in Connecticut, which "turns on 'the totality of contacts which the defendant' obligates itself to have, or contemplates that it will have, in this forum on the basis of the agreed upon performance in the contract." *Samelko*, 184 A.3d at 750 (quoting *Lombard Bros.*, 460 A.2d at 485–86). "The outer boundaries of what qualifies as a contemplated performance are broad." *Id.*

Success asserts that section 33-929(f)(1) applies because the NDA was made and performed in Connecticut. At the outset, however, Success did not submit the NDA in connection with its opposition to Shin Heung's motion to dismiss. While Success did eventually submit the NDA in connection with CRS's motion to transfer, more than a month after it opposed Shin Heung's motion, the Court questions the persuasive value of an agreement that Success did not even bother attaching to its briefing with respect to the present motion.

In any event, even assuming the NDA was made and performed in Connecticut, Shin Heung was not a party to that agreement. Rather, as Success concedes, the NDA was an agreement between CRS and Success. *See* Tarlow Decl. as to Shin Heung's Mot. ¶ 22 ("In July of 2019 Success and CRS signed a non-disclosure agreement (the 'NDA') . . . ."). In analogous cases in which plaintiffs have attempted to establish jurisdiction over a defendant by referencing an agreement to which the defendant was not a party, courts have commonly found that section 33-929(f)(1) does not apply. *See Halo Tech Holdings, Inc. v. Cooper*, No. CIV 307-CV-489 AHN, 2008 WL 877156, at *7 (D. Conn. Mar. 26, 2008) ("[T]his action does not arise from any contract to which [the defendant] was a party, and therefore, § 33–929(f)(1) does not support jurisdiction."); *Polylok, Inc. v. Bear Onsite, LLC*, No. 3:11CV01704 (AVC), 2012 WL 13028558, at *7 (D. Conn. Aug. 20, 2012) ("Because [the defendant] was not a party to the APA, the court does not need to

address whether jurisdiction can be established under that contract."); *Gerald Metals, S.A. v. Great N. Ins. Co.*, No. 3:06CV1207(AWT), 2007 WL 9753903, at *3 (D. Conn. Sept. 27, 2007) (similar); *Manka v. Walt Disney Co.*, 87 A.3d 1165, 1171 (Conn. App. Ct. 2014) ("The court's finding that the defendant was not a party to the contract defeats the argument that the cause of action is based on a contract entered into or to be performed in this state.").  Similar reasoning applies here; because Shin Heung was not a party to the NDA, section 33-929(f)(1) does not apply.

The Court is unpersuaded by Success' assertion that, even though Shin Heung is not a party to the NDA, section 33-929(f)(1) nonetheless applies because Shin Heung derived "significant benefit" from the NDA.  First, as noted, though Success' argument relies on the NDA, Success has not submitted that agreement in connection with its opposition.  Moreover, in making this argument, Success cites only to *Billie v. Coverall North America, Inc.*, 444 F. Supp. 3d 332 (D. Conn. 2020), a case that is readily distinguishable.  In *Billie*, the defendant at issue had required its workers to sign certain franchise agreements, and the plaintiffs had entered into such agreements with a separate entity that served as a franchisee of the defendant.  *Id.* at 338.  Although the defendant was not a party to those agreements, the court found that section 33-929(f)(1) applied because the plaintiffs were bound by the policies and procedures issued by the defendant, and because the defendant had drafted the franchise agreements, had the right to control much of the plaintiffs' conduct under the terms of the agreements, and derived significant benefit from the agreements.  *Id.* at 340.

Even assuming Shin Heung received a benefit from the fact that CRS and Success entered into the NDA—a fact Shin Heung denies, *see* Kim Decl. ¶ 12—the facts of this case are otherwise distinct from the circumstances in *Billie*.  Success has not argued that Shin Heung had the right to control Success' conduct under the NDA.  Nor has Success argued that Shin Heung drafted the

NDA or that Success was bound by Shin Heung's policies and procedures as the plaintiffs in *Billie* were bound by the policies and procedures of the defendant-franchisor in that case. Accordingly, *Billie* does not change the Court's conclusion.[14]

Based on the present record, the Court finds that section 33-929(f)(1) does not provide a basis for the Court to exercise jurisdiction over Shin Heung in this action.

### 2.  Section 33-929(f)(3)

The Court next finds that it may not exercise jurisdiction over Shin Heung pursuant to section 33-929(f)(3). The purpose of section 33-929(f)(3) is to enable Connecticut courts to exercise jurisdiction "in product liability suits" over manufacturers that "did not themselves directly ship their products to Connecticut." *OneBeacon Ins. Grp. v. Tylo AB*, 731 F. Supp. 2d 250, 255 (D. Conn. 2010). To satisfy section 33-929(f)(3), a plaintiff must demonstrate "(1) that the defendant could reasonably have anticipated being brought into court in Connecticut by a person who had used goods that it had distributed with the reasonable expectation that they would be used in Connecticut, and (2) that the plaintiff's cause of action is not materially different from an action that might have resulted directly from that use." *Divicino v. Polaris Indus.*, 129 F. Supp. 2d 425, 430 (D. Conn. 2001). In making this determination, the Court must look at the totality of the defendant's conduct and connection to Connecticut. *OneBeacon Ins. Grp.*, 731 F. Supp. 2d at 255.

Because this is not a products liability suit, the Court is doubtful that section 33-929(f)(3) applies. *See Cecarelli v. CSX Transp., Inc.*, No. 3:09-CV-1590 (MRK), 2012 WL 3599536, at *3 (D. Conn. Jan. 10, 2012) (noting that section 33-929(f)(3) is "concerned primarily with products

---

[14] Although Success alleges in the SAC that "[i]t was the intention of Success and CRS that Shin Heung would be a third-party beneficiary of the NDA," SAC ¶ 48, it has not briefed the issue of whether the Court can exercise jurisdiction over a party pursuant to section 33-929(f)(1) because that party was a third-party beneficiary to an agreement made and performed in Connecticut.

liability actions"). In any event, to satisfy section 33-929(f)(3), a plaintiff's cause of action must not be materially different from an action that might have resulted directly from the use of goods a defendant distributed with the reasonable expectation that they would be used in Connecticut. *Divicino*, 129 F. Supp. 2d at 430. Here, Success brings claims against Shin Heung alleging breach of contract and misappropriation of trade secrets. Success has made no arguments that these claims are akin to claims that may result directly from the use of goods Shin Heung distributed in Connecticut. Accordingly, the Court finds that section 33-929(f)(3) does not apply.

### 3. *Section 33-929(f)(4)*

Finally, the Court may not exercise jurisdiction over Shin Heung pursuant to section 33-929(f)(4). Section 33-929(f)(4) "provides for jurisdiction over a foreign corporation when the claim arises from tortious conduct in Connecticut." *Hamann v. Carpenter*, No. 3:16-CV-00501-VAB, 2017 WL 421646, at *8 (D. Conn. Jan. 31, 2017). Jurisdiction may be founded on section 33-929(f)(4) "only if the tortious conduct occurred in Connecticut, regardless of whether the injury was felt in Connecticut from tortious activity occurring outside Connecticut." *Amerbelle Corp. v. Hommell*, 272 F. Supp. 2d 189, 194 (D. Conn. 2003). Thus, "a court need only inquire as to the place where the tort occurred." *Id.* (emphasis omitted). Although "the defendant's literal presence in Connecticut when engaging in the actionable conduct" is not required, *JKB Daira, Inc. v. OPS-Tech., LLC*, No. 3:20-CV-1564 (SRU), 2022 WL 4484146, at *6 (D. Conn. Sept. 27, 2022), it is "not enough that the consequences of the defendant['s] acts impact a plaintiff in Connecticut," *Hamann*, 2017 WL 421646, at *8. Rather, the allegedly tortious conduct must "be directly and expressly targeted at the forum state." *Id.*

Success asserts that Shin Heung has committed two alleged tortious actions in Connecticut: downloading information from Success' servers in Connecticut, and wrongfully using Success'

trade secrets to sell SAM4s registers in Connecticut.  For the reasons below, Success has failed to establish a *prima facie* showing that the Court may exercise jurisdiction over Shin Heung pursuant to section 33-929(f)(4).

First, Success cites only to paragraph 36 of the Tarlow Declaration to support its assertion that Shin Heung downloaded information from Success' Connecticut servers.  *See* ECF No. 56 at 22.  Paragraph 36 of Tarlow's declaration, however, does not support this proposition.  Rather, it states that "CRS, Success, and Shin Heung conducted numerous telephone and Skype calls and exchanged data, quality testing documentation, design, and versions of the Software," that "[o]n multiple occasions, data and code was sent by Shin Heung from Korea to Connecticut," and that "Shin Heung authored and uploaded software files directly to an FTP site which Success either hosted or co-hosted from Connecticut."  Tarlow Decl. as to Shin Heung's Mot. ¶ 36.  These averments do not state that Shin Heung downloaded data from Connecticut servers; nor do they allege any tortious conduct—i.e., the misappropriation of trade secrets—that Shin Heung committed in Connecticut.  Rather, these averments describe the parties' purported interactions and agreed upon exchanges of data and information before any alleged improper use of Success' trade secrets took place.

The Court is unpersuaded by Success' citation to *Panterra Engineered Plastics, Inc. v. Transportation System Solutions, LLC*, 455 F. Supp. 2d 104, 110–11 (D. Conn. 2006), the only case it cites in support of its argument that Shin Heung committed tortious conduct in Connecticut by downloading information from Success' servers.  In *Panterra*, the plaintiff alleged that the defendant "visited [Connecticut] a number of times," recruited employees, and "downloaded [intellectual property] from computers in Connecticut, thereby committing tortious conduct within Connecticut."  *Id.*  Based on this theory, the district court found that the plaintiff had alleged

sufficient facts to support its allegations that the defendant committed tortious acts in Connecticut. *Id.* at 110. Here, by contrast, there does not appear to be any dispute that any representatives of Shin Heung ever entered Connecticut. While Shin Heung's presence in Connecticut is not required, Success must allege something more than merely that Success, while in Connecticut, exchanged data and information with Shin Heung, and that Shin Heung, while in South Korea and with Success' authorization, uploaded software to Success' Connecticut servers, in order to invoke section 33-929(f)(4).

Success' assertion that section 33-929(f)(4) provides a basis for jurisdiction because Shin Heung is wrongfully using Success' trade secrets to sell SAM4s registers in Connecticut likewise fails. In support of this assertion, Success cites only to paragraph 60 of the SAC, which states: "Upon information and belief, CRS has not yet removed Success' confidential and proprietary information from its software and continues to use, distribute to 3rd parties and profit from same." This allegation—which does not even pertain to Shin Heung—is plainly insufficient to suggest that Shin Heung directly and expressly targeted some tortious conduct at Connecticut.

For these reasons, Success has failed to make a *prima facie* showing that the Court can exercise jurisdiction over Shin Heung pursuant to section 33-929(f)(4) or any other provision of Connecticut's long-arm statute. Having found that exercising jurisdiction over Shin Heung is improper under Connecticut's long-arm statute, the Court need not reach the question of whether personal jurisdiction would comport with due process. *See Planned Furniture Promotions, Inc. v. City Antique, Inc.*, No. 3:14-CV-0279 MPS, 2014 WL 5481438, at *7 (D. Conn. Oct. 29, 2014) ("Because I have concluded that [the plaintiff] has alleged no basis upon which this Court may exercise personal jurisdiction under Connecticut's long-arm statute, I need not reach the question

whether personal jurisdiction would comport with the Due Process Clause of the Fourteenth Amendment.").

#### 4.   Request for Jurisdictional Discovery

Success requests jurisdictional discovery in the event the Court finds that it has "made a 'sufficient start' towards establishing personal jurisdiction."  ECF No. 56 at 26 (citing *Powder Coating Consultants v. Powder Coating Inst.*, No. 09CV200(WWE), 2009 WL 3418224, at *1 (D. Conn. Oct. 21, 2009)).  Success, however, has not shown that further jurisdictional discovery would be useful; nor has it made a "sufficient start" towards establishing personal jurisdiction. Rather, its arguments plainly fall short of providing a basis for the Court to exercise jurisdiction over Shin Heung under Connecticut's long-arm statute.  Success' request for jurisdictional discovery is therefore denied.

#### 5.   Request for Leave to Amend

Success further requests, in the alternative, that the Court permit it to amend its complaint to add factual allegations discussed in its opposition and in the Tarlow Declaration attached thereto.  The Court fails to understand why such allegations were not included in the SAC in the first instance, particularly given that it was the second time Success amended its complaint. Nevertheless, the Court has reviewed the factual allegations discussed throughout Success' briefing, the assertions in the Tarlow Declaration, and Success' representations based on the exhibits attached to its motion.  The Court finds that, regardless of whether these allegations, assertions, and representations were asserted in the SAC, Connecticut's long-arm statute would not be satisfied.  Accordingly, the Court denies Success' request to amend.

For these reasons, Shin Heung's motion to dismiss is granted.

## V.      CONCLUSION

For the reasons described herein, CRS's motion to transfer is denied, and Shin Heung's

motion to dismiss for lack of personal jurisdiction is granted.  The Clerk is directed to terminate

Shin Heung as a Defendant in this action.  This action shall proceed in this Court insofar as the

remaining claims in the Second Amended Complaint are alleged against CRS.

**SO ORDERED** at Hartford, Connecticut, this 31st day of March, 2023.

 /s/ Sarala V. Nagala
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE